```
            UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| ROBERT P. DIGIACOMO,<br><br>      Plaintiff,<br><br>  v.<br><br>THE PRUDENTIAL INSURANCE<br>COMPANY OF AMERICA,<br><br>      Defendant. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 06-CV-4558<br>(JEI)<br><br>**OPINION** |

**APPEARANCES:**

MILLER & GALLAGHER, ESQS.
By: Daniel J. Gallagher, Esq.
26 South Pennsylvania Avenue
Suite 201
Atlantic City, NJ 08401
    Attorneys for Plaintiff

WILSON, ELSER, MOSKOWITZ, EDLEMAN & DICKER, LLP
By: Seth Ptasiewicz, Esq.
33 Washington Street
Newark, NJ 07102
    Attorneys for Defendant

**IRENAS**, Senior District Judge:

    This case involves Defendant's denial of Plaintiff's long term disability benefits under 29 U.S.C. § 1001, *et seq.* ("ERISA") due to Plaintiff's allegedly fraudulent statements.[1] Defendant, the Prudential Insurance Company of America ("Prudential"), moves for summary judgment on Plaintiff Robert DiGiacomo's ("DiGiacomo") allegation that it unlawfully denied

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b).

1

his right to disability benefits under its long term disability policy.  Prudential also moves for summary judgment on its counterclaim seeking an equitable trust or constructive lien on the benefits it claims it wrongfully paid DiGiacomo.  For the reasons set forth below, Prudential's motion for summary judgment will be granted as to DiGiacomo's ERISA claim and denied as to the counterclaim.

**I.**

Robert DiGiacomo suffers from Miniere's Disease.[2]  He worked at the Sands Casino Hotel ("the Sands") in Atlantic City, New Jersey, from 1980 until April 29, 2003, at which time he was a Floor Manager, or "pit boss," with Shift Manager functions. (Pl. 56.1 Stat. ¶ 1).  The job required that DiGiacomo stand for approximately 7 hours per shift and work for a minimum of 40 hours per week. (Pl. 56.1 Stat. ¶ 2).  On April 29, 2003, DiGiacomo experienced an episode of vertigo and vomiting at work that resulted in medics carrying him off the casino floor.[3],[4]  Due

---

[2] Miniere's Disease, an inner ear disorder, is characterized by vertigo, hearing problems, tinnitus, and a feeling of pressure or fullness in the ear.  (Pl. Cert. Ex. K).

[3] DiGiacomo first experienced vertigo in July of 2000.  His physician, Dr. Robert Mingione, noted on July 8, 2000, that DiGiacomo's chief complaint was "vertigo: prob comb. Allergies + Miniere's." (Pl. Cert. Ex. B).

[4] Because DiGiacomo did not oppose Prudential's statement of material facts, the Court will presume that the facts are true

to that incident, DiGiacomo took a medical leave of absence.

On August 21, 2003, the Sands sent DiGiacomo a letter informing him that, pursuant to its leave of absence policy, DiGiacomo must return to work by September 25, 2003. (Pl. Cert. Ex. C). In October of 2003, DiGiacomo applied for Long Term Disability Benefits ("LTD Benefits") through Prudential's Group Policy G-41543 (the "Group Policy").[5],[6] A report signed by DiGiacomo's ear, nose, and throat specialist, Vytas B. Suliunas, DO, dated November 3, 2003, indicates that DiGiacomo completed a metabolic vertigo profile exam on October 21, 2003, and returned

---

unless they are controverted by the evidence in the record. *See Hill v. Algor*, 85 F. Supp. 2d 391, 408 n.26 (D.N.J. 2000) ("Under L. Civ. R. 56.1, facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted."); *Longoria v. New Jersey,* 168 F. Supp. 2d 308, 312 n.1 (D.N.J. 2001).

[5] Although it is Prudential's Group Policy, Ichan and Related Companies is the contract-holder of the Group Policy.

[6] To support his claim for LTD Benefits, DiGiacomo submitted a Claimant's Statement, an Employer's Statement, and an Attending Physicians Statement. DiGiacomo drafted his statement on October 20, 2003, which states that he cannot work due to "Miniers Disease." His answer to the question "[h]ow does this condition interfere with your ability to perform your job," was "chronic vertigo, unbalance, cannot focus, stand, control vomiting." The statement from his physician, Dr. Mingione, drafted on November 20, 2003, indicates that DiGiacomos's "profound vertigo" prevents him from returning to work. (Artis Cert. Ex. A). On December 1, 2003, Prudential's log of its phone call with DiGiacomo indicates that DiGiacomo stated he was at home all day and could only leave his house with his wife due to the severity of his disease. DiGiacomo stated that he gets severely dizzy when he reads, but that he hopes that when his condition gets "into control" he will be able to return to work in some capacity. (Artis Cert. Ex. B).

for a follow-up visit on October 31st. (Pl. Cert. Ex. L). The report states that DiGiacomo has "episodic vertigo, nausea, vomiting, left aural fullness consistent with left Miniere's Disease." (Id.).

In December of 2003, Prudential reviewed DiGiacomo's request for LTD Benefits. On December 17, Prudential sent a letter indicating that the request was approved, retroactive to October 26, 2003, and valid though February 29, 2004. (Pl. Ex. I). The letter further stated that,

> According to the Group Policy, you are disabled when Prudential determines that:
>
> you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(Id.).

On February 11, 2004, DiGiacomo saw Dr. Siliunas again. (Pl. Cert. Ex. M). The doctor indicated that while DiGiacomo had felt significant improvement, he experienced an exacerbation of the disease five weeks prior to the appointment. (Id.). The report concluded that DiGiacomo would be referred to Dr. Thomas Willcox, a neurotologist at Thomas Jefferson University Hospital,

4

for consultation.  (Id.).  Based upon Dr. Suliunas' report, on February 26, 2004, Prudential extended DiGiacomo's LTD Benefits through April of 2004.  (Artis Cert. ¶ 8).[7]

Dr. Willcox saw DiGiacomo on April 2, 2004, and concluded that he had left Miniere's disease.  (Pl. Cert. Ex. N). DiGiacomo then went for a follow-up visit with Dr. Suliunas on April 30, 2004, who found that DiGiacomo continued to suffer from the disease.  (Pl. Cert. Ex. O).  On May 24, 2004, Prudential Claims manager Brian Fuller noted that DiGiacomo states that he has good days and bad days.  Fuller suggested that Prudential obtain more information about DiGiacomo's limitations, including asking him if he drives.  (Artis Cert. Ex. E).[8]  In a follow-up telephone call on May 26, 2004, Aneesha Fain of Prudential asked DiGiacomo if he drives.  The call log indicates that DiGiacomo stated that although he has a license, upon his doctor's advice, he has not driven since September of 2003.  (Artis Cert. Ex. H).

Prudential then arranged for DiGiacomo to be observed, purportedly in an effort to gain a clearer understanding of

---

[7] While it is not clear from the record when Prudential decided to further extend DiGiacomo's benefits, the determination to deny his benefits did not occur until September 28, 2004. (Artis Cert. Ex. G).  Furthermore, in the letter notifying DiGiacomo that he is no longer eligible for benefits, Prudential noted that he had been paid LTD Benefits from October 26, 2003 through July 31, 2004. (Id.).

[8] Fuller's statements were typed on a "SOAP Note," Prudential's acronym for a "Subjective, Objective, Assessment, Plan."

5

DiGiacomo's daily activities.  Prudential obtained video of DiGiacomo engaging in physical activities on June 29, July 2, 3, 24, and August 20, 2004. (Artis Cert. Ex. K.).  Prudential observed DiGiacomo "walking, standing, entering and exiting a vehicle, driving, sitting and bending.  Additionally, DiGiacomo was observed for over two hours on two separate occasions working at the Nostalgia Room restaurant,[9] walking, standing, bending, taking reservations, managing staff, and performing other host duties."  (Artis Cert. Ex. L).

Based upon the findings of this surveillance, which allegedly contradict DiGiacomo's previous statements about his condition, Prudential terminated DiGiacomo's benefits on September 28, 2004, effective September 1, 2004. (Artis Cert. Ex. G).  Prudential relied on the Group Policy's fraud provision, which reads:

> **How Will Prudential Handle Insurance Fraud?**
>
> Prudential wants to ensure you and your Employer do

---

[9] In March of 2003, DiGiacomo established a business called Robrita, LLC.  (Pl. Cert. Ex. U).  Prudential asserts that on April 8, 2003, Robrita purchased the property where the Nostalgia Room Restaurant is located.  (Def. R. 56.1 Stat. ¶ 17).  An Atlantic City Newspaper reported that DiGiacomo's nephew owns the restaurant, and that DiGiacomo owns the building and helps his nephew with "the administrative aspects of the business." (Artis Cert. Ex. O).  The surveillance evidence indicates that DiGiacomo performed various functions for the restaurant during the summer of 2004, including host duties, managerial functions, and busing services.  (Artis Cert. Ex. S).  DiGiacomo does not refute the surveillance evidence, but claims that he was not paid for his efforts.  (Pl. R. 56.1 Stat. ¶ 21).

6

> not incur additional insurance costs as a result of
> the undermining effects of insurance fraud.
> Prudential promises to focus on all means necessary
> to support fraud detection, investigation and
> prosecution.
>
> In some jurisdictions, if you knowingly and with
> intent to defraud Prudential, file an application
> or a statement of claim containing any materially
> false information or conceal for the purpose of
> misleading, information concerning any fact
> material thereto, you commit a fraudulent insurance
> act, which is a crime and subjects you to criminal
> and civil penalties.  These actions will result in
> denial or termination of your claim, and, where
> such laws apply, are subject to prosecution and
> punishment to the full extent under any applicable
> law.  Prudential will pursue all appropriate legal
> remedies in the event of insurance fraud.

(Ewing Cert. Ex. A, p. 24).  The Group Policy further provides that Prudential has the right to recover for any overpayments due to fraud.  (Id. at p.23).

On July 17, 2004, DiGiacomo completed a questionnaire, the Comprehensive Claimant Statement, in which he indicated that his daily medication was helping him, except when the vertigo was very active, and that he could handle personal responsibilities when not experiencing a vertigo attack.  In response to the question, "what types of work do you feel you would be able to perform now or in the future?," DiGiacomo stated that he would like to return to work with flexible hours and a flexible schedule, but that it was "impossible presently" to return to work since the date of his disability.  In a description of his typical day, he stated that he was "homebound most of time," that

he did light household chores, cleaned the house, took out the trash, and watched his 9-year-old child.  In response to the question about the extent he uses available transportation, DiGiacomo said that he is driven to doctor appointments by his spouse, and takes public transportation only in emergencies. (Pl. Cert. Ex. Q).

On August 27, 2004, Dr. Willcox examined DiGiacomo and noted that DiGiacomo had been doing well until he experienced two episodes of vertigo lasting one hour each during the previous six weeks.  (Pl. Cert. Ex. R).  By a letter dated September 28, 2004, Prudential notified DiGiacomo that he was no longer eligible for LTD Benefits based upon his misrepresentations.  (Artis Cert. Ex. G).  DiGiacomo, through his attorney, appealed this decision three times, and three times Prudential upheld its initial determination to terminate his LTD Benefits.  (Artis Cert. Exs. P-W).

Dr. Willcox examined DiGiacomo again on January 27, 2006, and February 3, 2006.  (Pl. Exs. S, T). Dr. Willcox noted that prior to the January visit, DiGiacomo did not experience vertigo in one year, but that he had two severe attacks prior to his February examination. (Id.).  On September 25, 2006, Plaintiff commenced this action.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

A court reviewing an insurance company's denial of benefits under an ERISA plan generally does so under the arbitrary and

9

capricious standard.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-12 (1989); *Abnathya v. Hoffman La-Roche, Inc.*, 2 F.3d 40, 41 (3d Cir. 1993).  However, when the insurance company both funds and administers the benefits, as does Prudential, the Third Circuit has held that the standard is heightened due to the inherent structural conflict of interest. *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 378 (3d Cir. 2000).  The heightened standard requires that the Court's scrutiny increase as the insurance company's conflict increases. *Id.* at 379.[10]

Under the arbitrary and capricious standard, a "plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan. . . .  Furthermore, whether a claim decision is arbitrary and capricious requires a determination whether there was a basis for [the administrator's] decision, based upon the facts as known to the administrator at the time the decision was made."  *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 199-200 (3d Cir. 2002) (internal citations and quotations omitted).[11]

---

[10] Both parties acknowledge that this standard applies.

[11] In reviewing the denial of benefits determination, a Court may only rely on evidence that was before the administrator at the time it made its decision. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997). This limitation, however, does not apply for the Court's conflict of interest

To determine the level of conflict, the Court considers: "(1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction." *Stratton v. E. I. DuPont de Nemours & Co.*, 363 F.3d 250, 254 (3d Cir. 2004) (citing *Pinto*).

The Court assumes that there was some sophistication imbalance between DiGiacomo and Prudential, which elevates the standard of review. *See Stratton v. E. I. DuPont de Nemours & Co.*, 363 F.3d at 254 (assuming that plaintiff had no ERISA or claims experience and defendant, a large company, was highly experienced). No information balance will be inferred because DiGiacomo alleged none. *See id*. Similarly, there is no evidence in the record regarding factors three and four, and thus heightened scrutiny is not warranted based upon these factors. *See Marciniak v. Prudential Fin. Ins. Co. of Am.,* No. 05-4456, 2006 U.S. App. LEXIS 15607 (3d Cir. June 21, 2006) ("The burden of proof is on the claimant to show that a heightened standard of review is warranted in a particular case."). Courts also consider procedural anomalies, bias, and unfairness in determining the level of scrutiny. *Pinto,* 214 F.3d at 392. For

---

determination. *See Pinto*, 214 F.3d at 395.

the reasons set forth below, no such procedural error occurred. Thus, a slightly elevated standard of review is appropriate in this case.

The Court now turns to the claims process to determine whether Prudential's decision "is clearly not supported by the evidence in the record" or whether it "has failed to comply with the procedures required by the plan." *Stratton*, 363 F.3d at 256. "A reviewing court may not substitute its judgment for that of the [defendant]. Rather, it must determine if the [defendant's] decision was without reason or unsupported by substantial evidence." *Hunter v. Fed. Express Corp.*, 169 F. App'x 697, 703 (3d Cir. 2006)(citing *Abnathya*, 2 F.3d at 45).

DiGiacomo argues that Prudential's LTD Benefits determination was unsupported by the evidence. He argues that Prudential has no evidence that he is able to perform his job. He relies on Prudential's failure to obtain an independent medical evaluation or to obtain surveillance of him working on his feet for seven hours, as he did at the Sands. While DiGiacomo disagrees that the evidence upon which Prudential relies supports Prudential's denial of LTD Benefits, DiGiacomo does not refute the evidence.

The evidence reveals that DiGiacomo misrepresented his limitations to Prudential. On May 26, 2004, DiGiacomo told Prudential that he had not driven since September of 2003, and

that he primarily spends time with his child, watches television, and performs minor household chores.  When Prudential took surveillance video of him in late June and early July, 2004, however, DiGiacomo was observed driving on multiple occasions and helping his nephew operate his restaurant, the Nostalgia Room.  On July 17, DiGiacomo further advised Prudential of his limitations through a Comprehensive Claimant Statement, in which he stated that he was homebound most of the time due to his vertigo attacks.  Seven days later, on July 24, 2004, DiGiacomo was again observed hosting, carrying boxes, and otherwise assisting the operations of the Nostalgia Room Restaurant.  Thus, based upon the evidence considered by Prudential, the Court cannot say that Prudential's decision to deny his LTD Benefits was arbitrary or capricious, even under the heightened standard.

DiGiacomo further claims that Prudential's decision did not comply with the procedures set forth in the Group Policy.  According to the Group Policy, a covered employee is initially considered disabled if, due to sickness or injury, he is unable to perform the duties of his regular occupation.  After 24 months of the employee's receipt of LTD Benefits, Prudential will deem him disabled if "due to the same sickness or injury, you are unable to perform the duties of *any gainful occupation* for which you are reasonably fitted by education, training or experience." (Pl. Ex. I)(emphasis added).

13

Prudential did not wait for 24 months to consider whether DiGiacomo was unable to do any occupation, but instead determined DiGiacomo was ineligible for LTD Benefits after 10 months. DiGiacomo asserts that this decision was a procedural violation because, while DiGiacomo could not perform his occupation at that time, he could have done another job for which he was qualified, such as one involving a flexible schedule.

Prudential, however, did not rely on its definitions of disability in the Group Policy.  Instead, it relied on the fraud provision, which allows Prudential to deny benefits at any time based upon a claimant's misrepresentations.  The fraud provision expressly states that a claimant's material misrepresentations "will result in denial or termination of your claim." (Ewing Cert. Ex. A., p. 24).  The fact that Prudential relied upon its fraud provision instead of its definitions of disability is not evidence that Prudential failed to comply with its procedures. Accordingly, Prudential's motion for summary judgment on DiGiacomo's ERISA claim will be granted.

## IV.

Prudential also seeks summary judgment on its counterclaim for a constructive trust or equitable lien for the monies it paid to Plaintiff based upon Plaintiff's fraudulent statements.  Under ERISA, a Plan fiduciary may institute an equitable action seeking

14

restitution where money belonging to the Plan can clearly be traced to particular funds or property in the beneficiary's possession.  *See* 29 U.S.C. § 1132(a)(3)(B)(providing that a fiduciary can bring an action for "appropriate equitable relief"); *Sereboff v. Mid Atl. Med. Servs.*, 126 S. Ct. 1869, 1874 (2006).  Both the basis for the claim and the relief sought must be equitable in nature.  *Sereboff,* 126 S. Ct. at 1874.  A fiduciary who seeks to impose personal liability on a beneficiary seeks a legal, not an equitable remedy.  *Id.; See also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002)("for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession").

In *Sereboff,* the plan required that beneficiaries who recover from third parties, as a result of a third party's act or omission, reimburse the insurance company for benefits it paid.  126 S. Ct. at 1872.  After receiving benefits under defendant's plan, the Sereboffs filed and subsequently settled a tort action it brought against a third-party as a result of an automobile accident.  *Id.*  Defendant, the insurance company, sued to recover the funds it paid to the Sereboffs, which the Sereboffs placed in a fund under their control.  *Id.* at 1875.  The Court held that the basis for defendant's claim for reimbursement was equitable

15

in nature because: (1) the relief sought was for specifically identifiable funds in the beneficiary's possession and control; and (2) the funds belonged to the insurance company under the terms of the policy. 126 S. Ct. at 1874, 77.

Here, there is no dispute that Prudential is a fiduciary under ERISA. Moreover, like in *Sereboff,* the Group Policy contains a provision for the repayment of benefits under certain circumstances. DiGiacomo's sole argument is that the Court should not grant Prudential the relief it seeks because he is entitled to the LTD Benefits that he received. This argument fails because the Court has concluded that DiGiacomo's receipt of benefits was premised on his misrepresentations, and the Group Policy allows Prudential to recover monies paid as a result of fraud. (Ewing Cert. Ex. A., p.23). There is, however, no evidence that the benefits Prudential paid to DiGiacomo are in a specifically identifiable fund or in DiGiacomo's control, as they were in *Sereboff*. Thus, the Court cannot say as a matter of law that the relief Prudential seeks is equitable in nature.[12]

Moreover, even if Prudential's claim were equitable in nature, summary judgment would not be warranted because it is unclear whether DiGiacomo was entitled to any portion of the

---

[12] *See Reichert v. Liberty Life Assur. Co.,* 2007 U.S. Dist. LEXIS 8347, *32-33 (D.N.J. 2007)(denying summary judgment on defendant's cross-claim for reimbursement under ERISA because the overpaid benefits were no longer in Plaintiff's possession, making the claim for restitution legal, not equitable).

benefits he received.  Prudential does not contest that DiGiacomo suffers from Miniere's disease.  While Prudential discovered in June and July of 2004 that DiGiacomo had previously misrepresented the extent of his limitations, the record does not reveal whether earlier surveillance would have shown DiGiacomo performing activities he stated he could not perform, or whether the first time DiGiacomo did so was in the Summer of 2004.  Thus, the Court cannot determine the precise amount of benefits that Prudential wrongfully paid.  Accordingly, Prudential's motion for summary judgment on its counterclaim will be denied.

### V.

For the reasons set forth above, Prudential's motion for summary judgment will be granted as to DiGiacomo's ERISA claim, and will be denied as to Prudential's counterclaim.  The Court will issue an appropriate order.

Dated: August 10, 2007.

s/*Joseph E. Irenas*<br>**JOSEPH E. IRENAS**, S.U.S.D.J.